IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| ELLEN J. O'PHELAN, | ) | CIVIL NO. 09-00236 SOM/KSC |
| | ) | |
| Plaintiff, | ) | ORDER GRANTING IN PART AND |
| | ) | DENYING IN PART DEFENDANT |
| vs. | ) | GERARD LEE LOY'S MOTION FOR |
| | ) | SUMMARY JUDGMENT [ECF NO. |
| GERARD LEE LOY, BENTON BOLOS, | ) | 221]; ORDER GRANTING SUMMARY |
| individually and as Police | ) | JUDGMENT IN FAVOR OF |
| detective, COUNTY OF HAWAII, | ) | DEFENDANTS BENTON BOLOS AND |
| | ) | COUNTY OF HAWAII [ECF NO. |
| Defendants. | ) | 224] |
| _____ | ) | |

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT GERARD LEE
LOY'S MOTION FOR SUMMARY JUDGMENT [ECF NO. 221];
ORDER GRANTING SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS BENTON
BOLOS AND COUNTY OF HAWAII [ECF NO. 224]

I.      INTRODUCTION.

        Defendant Gerard Lee Loy and Defendants Benton Bolos

and the County of Hawaii ("County") seek summary judgment on the

entirety of Plaintiff Ellen O'Phelan's First Amended Complaint

against them.  The gravamen of O'Phelan's claim is that her

medical records were allegedly wrongfully disseminated.  The

court concludes that, in light of O'Phelan's diminished

expectation of privacy in the records given the pending

litigation, and the limited nature of the disclosure, the alleged

wrong is not of sufficient magnitude to constitute a

constitutional violation cognizable under 42 U.S.C. § 1983.  The

court therefore grants partial summary judgment to Defendants on

this basis.  Alternatively, Bolos is entitled to qualified

immunity on the § 1983 claim because, even if he violated

O'Phelan's constitutional right to informational privacy, the contours of that right were not clearly established as including the wrong alleged here at the time it occurred.  The County is also entitled to summary judgment on the § 1983 claim because O'Phelan introduces no evidence that the County had a policy or custom permitting disclosure of confidential medical records, or that Bolos had final decisionmaking authority.

The court denies summary judgment to Lee Loy on O'Phelan's common law claims for invasion of privacy and civil conspiracy given a genuine issue of material fact as to whether Lee Loy and Bolos conspired to have Lee Loy see O'Phelan's medical records without O'Phelan's consent and without going through proper legal channels.  However, Bolos and his former employer, the County, are entitled to immunity with respect to the invasion of privacy claim, as well as O'Phelan's other common law claims, because O'Phelan produces no evidence that Bolos or the County acted with  malice toward O'Phelan.

The court dismisses the remainder of O'Phelan's common law claims because she has failed to produce evidence sufficient to create a genuine issue of material fact as to Defendants' liability for trespass to chattels, negligent infliction of emotional distress, or intentional infliction of emotional distress.

II.      FACTUAL BACKGROUND.

As it must on a motion for summary judgment, the court considers facts properly presented to the court in the light most favorable to the nonmoving party.  See Miller v. Glenn Miller Prods., Inc., 454 F.3d 975, 987 (9th Cir. 2006).  However, the court does not scour the record for any and all relevant facts, instead relying on the parties to provide the court with the facts relevant to their motions or opposition.  See Local Rule 56.1; Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996).

A.      Alleged Sexual Assault and Ensuing State
        Court Lawsuits.

O'Phelan states that she was sexually assaulted by Jeff Meek on May 18, 2008, on the Big Island of Hawaii.  First Amended Compl. ("FAC") ¶¶ 1-3,[1] ECF No. 26.  Marylou Askren is or was Jeff Meek's girlfriend, and O'Phelan alleges that Askren was Meek's accomplice in the sexual assault and that Askren stole jewelry from O'Phelan.  FAC ¶¶ 2-3, 14-15.  O'Phelan reported the rape after her own arrest on May 18, 2008, apparently for property damage.  FAC ¶¶ 6-7.  Defendant Bolos was assigned as the lead Hawaii County Police Department ("HCPD") detective to

_____

[1]Because the parties do not appear to dispute certain background facts relevant to this lawsuit, and because neither party presents evidence supporting these facts on summary judgment, the court draws certain background facts from O'Phelan's First Amended Complaint solely to place proffered evidence into context.

investigate O'Phelan's sexual assault case.  Declaration of
Benton Bolos ("Bolos Decl.") ¶ 4, ECF No. 223-2.

      B.        O'Phelan's Emergency Room Visit and the
                    <u>Generation of Medical Records.</u>

On May 19, 2008, O'Phelan went to the emergency room of
the Hilo Medical Center and was examined for sexual assault.  The
hospital generated what the parties refer to as a "SANE report"
("Sexual Assault Nurse Examiner" report), which included a brief
overview of O'Phelan's medical history, as well as the sexual
assault nurse examiner's findings.  Concise Stmt. Facts Supp.
Benton Bolos' Mot. Qualified Immunity & Benton Bolos & County of
Hawaii's Mot. J. Pleadings or Mot. Summ. J. ("County's Facts")
No. 4, ECF No. 223; Concise Stmt. Facts Supp. Pl.'s Opp. Mot.
Summ. J. ("Pl.'s Facts") No. 4, ECF No. 282-3.  Both sides agree
that the hospital also generated certain other records, included
in what are referred to as "HMC records," as a result of the May
19, 2008, visit.  County's Fact No. 6; Pl.'s Fact No. 6.  The HMC
records included a toxicology report, which was marked
"outpatient medical records" at the bottom.  County's Fact Nos.
12-13; Bolos Decl. ¶ 12 & Exh. 6.

O'Phelan signed two release forms while there: one
permitting the hospital to release the hospital's medical
findings and related information, as well as evidentiary
specimens, "to the appropriate law enforcement officials," and a
second form authorizing the hospital to release her "entire

medical record" to HCPD for "legal purposes."  <u>See</u> Bolos Decl.
Exhs. 2, 5; Pl.'s Fact Nos. 3, 8-9.  The hospital subsequently
released the SANE report and the HMC records to Bolos, who
incorporated the records and report into his investigation.
County's Fact Nos. 5, 10; Bolos Decl. ¶¶ 10-11.

It is undisputed that, prior to any alleged
unauthorized disclosure of medical records by Bolos, Plaintiff's
husband (and her attorney) Dan O'Phelan gave Bolos a copy of the
toxicology report and indicated that Ellen O'Phelan did not
object to any subsequent redisclosure of the report.  County's
Fact Nos. 11, 14-16; Pl.'s Fact Nos. 11, 14-16; Declaration of
Dan O'Phelan ("Dan O'Phelan Decl.") ¶ 5, ECF No. 282-2.  O'Phelan
testified during her deposition that she considered the
toxicology report "public knowledge."  County's Fact No. 16.
According to Mr. O'Phelan, the toxicology report was used as an
exhibit at trial in August 2008 in one of the state court civil
cases stemming from the alleged rape.  Dan O'Phelan Decl. ¶ 5.

C.      <u>Initial State Court Civil Litigation.</u>

On May 23, 2008, O'Phelan obtained a temporary
restraining order in state court, proceeding number SS-08-1-148,
against Meek and Askren.  FAC ¶ 16.  On August 8, 2008, O'Phelan
and Dan O'Phelan filed a civil action in state court, case number
3CC 08-1-257, against Meek and Askren.  FAC ¶ 19.  Lee Loy is
presently counsel for Askren in both state cases.  FAC ¶¶ 19, 22.

On August 11, 2008, a hearing or trial was held in the state court restraining order proceeding. The restraining order was continued in effect such that a three-year restraining order was entered against Meek and Askren. Askren was not represented by counsel at that point. FAC ¶ 20.

        D.        The Alleged Conspiracy to Disclose Medical Information.

At a state court hearing on September 12, 2008, Lee Loy entered an appearance for Askren and moved to set aside the three-year restraining order. <u>See</u> Transcript of Hearing, Case No. 3SS 08-1-148, Sept. 12, 2008, Dan O'Phelan Decl. Exh. 1. During the hearing, Lee Loy made the following statements to Judge Freitas:

> Lee Loy: . . . So, Judge, I'm prepared to say that if you allow further hearing on this case, I will get you the police record [of Ellen O'Phelan] which I saw yesterday at 4:20 p.m. with Detective Ben Bolos.

<u>Id.</u> at 5-6.

> Lee Loy: . . . . I'm saying if you look at -- the hospital record from -- from Ellen O'Phelan, the next day not that night, there is no report . . . .
>
> The Court (Judge Freitas): Where are you gonna get any of these things, sir?
>
> Lee Loy: From the -- I got -- I can get it from -- yesterday I saw -- I talked to Detective Ben Bolos. Ben --
>
> The Court: The police report?

Lee Loy: I saw the police reports. I saw --
not the police -- I saw --

The Court: Officer Bolos was here, and I
didn't allow his testimony because there was
objections to it.

Lee Loy: Judge, I see the police report.

. . . .

The Court: So . . . there was knowledge that
all of this evidence was there.

Lee Loy: Judge --

The Court: It just wasn't gotten.

Lee Loy: Judge, when -- last week when I
first came into this case I tried to get a
police report.  Ben Bolos told me he hasn't
yet gotten the hospital stuff, and so I had
to wait.  And I told him "Good.  When you get
the stuff, I'll let you talk to my client."
So I get to talk to him yesterday afternoon
at 4:20, and I'm looking at these things. And
I'm saying, Judge, if you saw these kind of
things, you woulda had – be able to add on
why that lady's credibility was in serious
issue . . . .

The Court: My question, sir, is your client
knew she was at the hospital.  How can they
now say that they knew no medical records
existed – . . . because medical records are
done everytime anyone goes to the hospital.

Lee Loy: Judge, as you know that hospital
records requires the consent of the . . . .
Wait, Judge, and -- and I talked -- I told
you that I'm making a representation I can
get from Detective Ben Bolos. . . . We didn't
have evidence, Judge. Until -- until Ben
Bolos got it it wasn't part of the police
records . . . . He didn't have it last week.

Id. at 10-14.

7

Lee Loy: . . . . And I am saying to you now, Judge, when we're still in a timely fashion I have additional evidence that if you'll allow me to get that . . . . I just didn't have enough time yesterday to get Mr. Bolos, and he doesn't come to work today 'til 2:45. But I do have now a police report which I believe he will testify it was not available to him last week or to the police last week so it was not discoverable to either defendant through the police last week.

The Court: You're referring to the police report or the medical records?

Lee Loy: The police report which now includes the medical –- some medical records.

The Court: So really what you're referring to is the medical records that are now in the police report?

Lee Loy: Right.

The Court: The medical records that could have been discoverable earlier . . . because the medical records probably existed from the date that Ms. O'Phelan went to the hospital.

Lee Loy: Judge, I don't know that. . . .

The Court: Neither do I, sir.

. . . .

Lee Loy: I got – I'm just telling you, Judge. Yesterday afternoon I got from Detective Ben Bolos new evidence.

Id. at 20-21.

Lee Loy: But I'd like to point out, um, not only did I say that the police –- I believe the evidence –- new evidence if allowed will prove that the police didn't have the medical records until after the hearing – after the court ruled in this particular case, which I believe was the 11th? Um –-

The Court: So we're just referring again to the medical records as the new evidence?

Lee Loy: The new -- the medical records that Ben Bolos showed me yesterday which --

The Court: You know what the date of those medical records were?

Lee Loy: No.

. . .

But I know -- I know that it's -- it's electronically signed by Laura Kent. I know it makes reference to him gouging her private parts, pain.

Id. at 40-41.

In addition to relying on Lee Loy's statements in court, O'Phelan points to three phone calls as evidence that Bolos disclosed O'Phelan's medical records to Lee Loy. First, O'Phelan testified that Bolos called her in the "early Fall of 2008" and told her that Bolos had, in some form or manner, provided O'Phelan's "medical records" to Lee Loy and Lee Loy's client, Askren, while the three met at the Hawaii County Police Station. This action was allegedly intended by Bolos to "get [Askren] to talk" to him. The record is not clear as to precisely when this call allegedly took place, but O'Phelan appears to testify during her deposition that Bolos called her after he had shown the records to Lee Loy and Askren. See Declaration of Ellen O'Phelan ("Ellen O'Phelan Decl.") ¶ 3; Declaration of Brooks L. Bancroft ("Bancroft Decl.") Exh. 9

[Depo. Ellen J. O'Phelan, Oct. 2, 2010] 131:16-20, 131:24-25, 132:15-23; id. Exh. 10 [Depo. Ellen J. O'Phelan, Oct. 2, 2010] 180:14-17, 180:20-25, 181:1-10; id. Exh. 11 [Depo. Ellen J. O'Phelan, Oct. 2, 2010] 149:3-18, 169:6-25. O'Phelan does not know which part or parts of the medical records were allegedly provided to Lee Loy and Askren, and does not know whether they were simply shown the records or actually given the records. See id. Exh. 11 [Depo. Ellen J. O'Phelan, Oct. 2, 2010] 149:3-18, 167:19-25, 168:1-4, id. Exh. 16 [Depo. Ellen J. O'Phelan, Oct. 2, 2010] 163:13-22; id. Exh. 17 [Depo. Ellen J. O'Phelan, Oct. 2, 2010] 138:17-25, 139:1-5, 140:15-25, 141:1-25, 142:1-13.[2]

Second, Dan O'Phelan was also deposed in this case. He testified that, around September 2008, Lee Loy called Mr. O'Phelan and said, "I'm looking at your wife's medical records," which Mr. O'Phelan understood to mean that Lee Loy had looked or was then looking at Ms. O'Phelan's medical records. Bancroft Decl. Exh. 20 [Depo. Dan O'Phelan, Oct. 3, 2010] 198:1-199:8; Dan O'Phelan Decl. ¶ 1.

---

[2]Ellen O'Phelan's declaration also claims that Lee Loy made "detailed statements about my medical records in 2008, prior to any authorized release, without my authorization." Ellen O'Phelan Decl. ¶ 4. Rather than provide evidence of these statements based on her personal knowledge, O'Phelan simply references two of her prior filings in this case. Id. The court declines to search through the record in this case to find relevant information not specifically identified by O'Phelan. See Local Rule 56.1; Keegan, 91 F.3d at 1279.

Third, Mr. O'Phelan testified that, around September 2008, Bolos called him and stated that Bolos was planning to provide Ms. O'Phelan's medical records to Lee Loy, but Mr. O'Phelan did not know which part or parts of the medical records were allegedly provided.  Bancroft Decl. Exh. 7 [Depo. Dan O'Phelan, Oct. 3, 2010] 188:3-25, 189:1-25; Dan O'Phelan Decl. ¶ 4.

Bolos denies O'Phelan's version of events entirely.  He denies agreeing to disclose O'Phelan's personal records or information to Lee Loy in exchange for Lee Loy's letting Bolos take a statement from Askren.  Bolos Decl. ¶ 6.  Bolos denies that he ever met with Lee Loy and Askren at the Hawaii County Police station.  County's Fact No. 19; Bolos Decl. ¶ 14.  Bolos denies that he ever told Lee Loy about or gave Lee Loy copies of medical information or other personal records related to Ellen O'Phelan or the incident.  Bolos Decl. ¶ 7.  He denies that he ever called Ellen or Dan O'Phelan regarding disclosure of Ellen O'Phelan's medical records.  Bolos Decl. ¶¶ 8-9.

Lee Loy also denies that he conspired with Bolos.  Declaration of Gerard Lee Loy ("Lee Loy Decl.") ¶¶ 21, 38, ECF No. 221-1.  According to Lee Loy, at some point before September 11, 2008, Lee Loy told Bolos that Lee Loy would advise Askren to waive her Fifth Amendment rights if Bolos (not Lee Loy) would first obtain O'Phelan's medical records.  Lee Loy Decl. ¶ 14;

Declaration of Marylou Askren ("Askren Decl.") ¶ 3, ECF No. 221-2. Lee Loy states that he said this because he thought O'Phelan's version of events, as explained to him by Askren, did not make sense. Id. On September 11, 2008, Lee Loy saw that Bolos had certain documents, and Bolos told Lee Loy those documents were medical records. Lee Loy Decl. ¶ 5. Lee Loy denies that he saw any of the documents' contents or that Bolos disclosed the contents to Lee Loy. Lee Loy Decl. ¶¶ 4-5, 9. Askren did meet with Bolos. Lee Loy Decl. ¶ 28; Askren Decl. ¶¶ 5-7, 15.

Lee Loy states that he chose his words poorly during the September 12, 2008, state court hearing but that he was merely attempting to advocate for his client. Lee Loy Decl. ¶ 7. Lee Loy states that he was attempting to persuade the court to call Bolos and require Bolos to bring the records to court. Lee Loy Decl. ¶ 27. Lee Loy denies that he ever had a conversation with Dan O'Phelan in which Lee Loy said he was looking at Ellen O'Phelan's medical records. Lee Loy Decl. ¶ 19.

Finally, it is undisputed that Ellen O'Phelan's medical records, as reflected in the HCPD file, were ultimately produced by HCPD in 2009 pursuant to subpoena in one of the underlying civil suits. See Lee Loy Decl. ¶ 15; Dan O'Phelan Decl. ¶ 3 (acknowledging that the medical records were "legally released" in 2009).

E.        HCPD Policies and Training Regarding Release
          of Confidential Information.

The County presents uncontradicted evidence, through
declarations of Benton Bolos and Marshall Kanehailua, an
Assistant Police Chief for HCPD, that HCPD maintains a General
Order prohibiting the unauthorized disclosure of personal
information, and that Bolos was trained on this policy. See
Declaration of Marshall Kanehailua ("Kanehailua Decl.") ¶¶ 4-6 &
Exh. 1, ECF No. 223-1; Bolos Decl. ¶ 3.  According to Kanehailua,
HCPD complies with the federal Health Insurance Portability and
Accountability Act's requirements for disclosure of personal
information, as well as Hawaii's Uniform Information Practices
Act.  Kanehailua Decl. ¶ 7.  Kanehailua states that HCPD's
internal affairs division investigated O'Phelan's complaint
against Bolos, and HCPD conducted a criminal investigation as
well.  Id. ¶¶ 10-11.  HCPD forwarded the results of the criminal
investigation to the Office of the Prosecuting Attorney.  Id.
¶ 11.  Bolos also states that he has been trained in conducting
sexual assault investigations.  Bolos Decl. ¶ 3.  Finally, Bolos
states that his highest position in HCPD was as
Sergeant/Detective and that he did not have final decisionmaking
authority within HCPD.  Bolos Decl. ¶¶ 2, 15.  Bolos is now
retired.  Bolos Decl. ¶ 2.

III.     <u>PROCEDURAL HISTORY.</u>

O'Phelan filed the present lawsuit on May 26, 2009, against Lee Loy, Benton Bolos, and the County. ECF No. 1. She filed her First Amended Complaint on October 16, 2009. ECF No. 26. O'Phelan asserts seven claims for relief against all Defendants: (1) a violation of her constitutional informational privacy right, asserted under 42 U.S.C. § 1983; (2) conspiracy; (3) trespass to chattels; (4) trespass to land; (5) negligent infliction of emotional distress; (6) invasion of privacy; and (7) intentional infliction of emotional distress. The heart of O'Phelan's claims concerns an alleged conspiracy by Lee Loy and Bolos "to obtain Plaintiff's medical records without a subpoena, interrogatories, and/or court order for discovery." FAC ¶ 42. In addition to damages, costs and attorney's fees, O'Phelan requests that the court order the County to "proper[ly]" inventory, preserve, and secure evidence related to her rape and theft allegations and take DNA evidence and hair samples from alleged rapists. FAC at 22-23. She also requests injunctive relief prohibiting attorneys and other third parties from accessing police officers "without proper authorization." FAC at 23.

In response to a motion to dismiss by Lee Loy, Judge Samuel P. King held that the allegations of the FAC plausibly stated the denial of a federal right. <u>See</u> Order Granting in Part

14

and Denying in Part Def. Lee Loy's Mot. to Dismiss 7-10, Jan. 27, 2010, ECF No. 41. Judge King suggested that "[m]any questions might arise on the merits," but denied the motion to dismiss the § 1983 claim at the pleading stage. He then declined to exercise supplemental jurisdiction over O'Phelan's state law cause of action for trespass because it did not arise out of the same case or controversy as the federal claims, and that claim was dismissed. Id. at 10-11. Discovery closed on January 21, 2011, and the trial of this matter is set for March 22, 2011. See Third Amended Rule 16 Scheduling Order, ECF No. 160.

IV.     LEGAL STANDARD.

Summary judgment shall be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). Accordingly, "[o]nly admissible evidence may be considered in deciding a motion for summary judgment." Miller, 454 F.3d at 988; see also Fed. R. Civ. P. 56(c). A moving party has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).

15

The burden initially falls on the moving party to identify for the court "the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323); accord Miller, 454 F.3d at 987. "A fact is material if it could affect the outcome of the suit under the governing substantive law." Miller, 454 F.3d at 987.

When the moving party fails to carry its initial burden of production, "the nonmoving party has no obligation to produce anything." In such a case, the nonmoving party may defeat the motion for summary judgment without producing anything. Nissan Fire, 210 F.3d at 1102-03. On the other hand, when the moving party meets its initial burden on a summary judgment motion, the "burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial." Miller, 454 F.3d at 932. The nonmoving party may not rely on the mere allegations in the pleadings and instead "must set forth specific facts showing that there is a genuine issue for trial." Porter v. Cal. Dep't of Corr., 419 F.3d 885, 891 (9th Cir. 2005) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). The court must not weigh the evidence or determine the truth of the matter but only determine whether there is a genuine issue for trial. See Balint v. Carson City, 180 F.3d 1047, 1054

(9th Cir. 1999). On a summary judgment motion, "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor." Miller, 454 F.3d at 988 (quotations and brackets omitted).

V.       ANALYSIS.

      A.       Lee Loy's Rule 56(f) Request.

      Lee Loy requests, in a brief sentence, "relief under Rule 56(f) Fed. R. Civ. Pro. As I have not fully reviewed Dan O'Phelan's deposition transcript received today and further depositions are scheduled, including mine." Def. Lee Loy's Mot. Summ. J. ("Lee Loy Mot.") 2, ECF No. 221. The court construes this request as made pursuant to Rule 56(d) of the Federal Rules of Civil Procedure,[3] which permits the court to allow additional time to take discovery, among other alternatives, "if a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition."

      "A party requesting a continuance pursuant to Rule 56(f) must identify by affidavit the specific facts that further discovery would reveal, and explain why those facts would preclude summary judgment." Tatum v. City & Cnty. of S.F., 441 F.3d 1090, 1100 (9th Cir. 2006). "Failure to comply with the requirements of Rule 56(f) is a proper ground for denying

------

      [3]The provisions now found in subsection (d) of Rule 56 were set forth in subsection (f) prior to December 1, 2010.

discovery and proceeding to summary judgment." <u>Brae Transp.,</u>

<u>Inc. v. Coopers & Lybrand</u>, 790 F.2d 1439, 1443 (9th Cir. 1986);

<u>see also</u> <u>Tatum</u>, 441 F.3d at 1100 (finding that an attorney's

declaration was insufficient to support a Rule 56(f) continuance

when the declaration failed to explain how a continuance would

allow the party to produce evidence precluding summary judgment).

"To prevail on a Rule 56(f) motion, the movant must also show

diligence in previously pursuing discovery." <u>See</u> <u>Painsolvers,</u>

<u>Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 732 F. Supp. 2d 1107,

1124 (D. Haw. 2010).

Lee Loy includes no explanation, much less an affidavit

or declaration, addressing why he is entitled to relief under

Rule 56.  His request is denied.

B.        <u>Section 1983 Claim (First Cause of Action).</u>

Section 1983 provides:

> Every person who, under color of any statute,
> ordinance, regulation, custom, or usage, of
> any State or Territory or the District of
> Columbia, subjects, or causes to be
> subjected, any citizen of the United States
> or other person within the jurisdiction
> thereof to the deprivation of any rights,
> privileges, or immunities secured by the
> Constitution and laws, shall be liable to the
> party injured in an action at law, suit in
> equity, or other proper proceeding for
> redress . . . .

42 U.S.C. § 1983.

"[Section] 1983 'is not itself a source of substantive

rights,' but merely provides 'a method for vindicating federal

rights elsewhere conferred.'"  Graham v. Connor, 490 U.S. 386,

393-94 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 144 n.3

(1979)).  "Traditionally, the requirements for relief under

[§] 1983 have been articulated as: (1) a violation of rights

protected by the Constitution or created by federal statute,

(2) proximately caused (3) by conduct of a 'person' (4) acting

under color of state law."  Crumpton v. Gates, 947 F.2d 1418,

1420 (9th Cir. 1991).  O'Phelan alleges that she had a

constitutionally protected right to keep her medical information

private and that "Lee Loy conspired with Benton Bolos to obtain

Plaintiff's medical records without a subpoena, interrogatories,

and/or court order for discovery."  FAC ¶ 42.  Whether the facts

before the court, viewed in the light most favorable to O'Phelan,

allege a constitutional violation is a pure legal question for

the court.  See Martinez v. Stanford, 323 F.3d 1178, 1183 (9th

Cir. 2003); Davis v. Bucher, 853 F.2d 718, 719-21 (9th Cir.

1988).

     The existence and scope of a constitutional right to

informational privacy is far from crystal clear.  Faced with

assertions of a right of informational privacy, appellate courts

have expressly refrained from defining the scope of the right,

leaving the matter to lower courts to discern on a case-by-case

basis.  Indeed, the Supreme Court's most recent discussion of the

matter, NASA v. Nelson, __ U.S. __, 131 S. Ct. 746 (2011),

explicitly "assume[d], without deciding" that the Constitution did protect such a right, but expressly declined to consider the right's scope. Id. at 751. The Court noted that it had announced that such a right existed in 1977 but had said virtually nothing on the matter in the more than 30 years since. See id. at 751, 756 (citing Whalen v. Roe, 429 U.S. 589, 599-600 (1977), and Nixon v. Admin. of Gen. Servs., 433 U.S. 425, 457 (1977)). Declining to articulate the scope of such a right, the Court ruled that the plaintiffs' claims for invasion of privacy failed on other grounds. Id. at 762-64. In his concurrence, Justice Scalia opined that "[a] federal constitutional right to 'informational privacy' does not exist." Id. at 764.

The Ninth Circuit has recognized a constitutional right of informational privacy. See, e.g., In re Crawford, 194 F.3d 954, 958 (9th Cir. 1999) (explaining that indiscriminate disclosure of social security numbers could violate this right). However, the Ninth Circuit has held that the right is not necessarily coextensive with a statutory or common law right of privacy. Instead, it is limited, such that "the mere fact that the allegedly tortious conduct was performed by a state actor does not support its characterization as a constitutional wrong." Davis, 853 F.2d at 720.

This court has carefully studied the Ninth Circuit's decision in Davis. In that case, an inmate and his wife brought

a § 1983 action against a state correctional officer and his superiors, alleging that the inmate's right to privacy was violated when the officer examined four nude photographs of the inmate's wife, showed them to two other inmates, and made derogatory comments to a desk sergeant regarding the wife's anatomy. 853 F.2d at 719. The Ninth Circuit held that, although the inmate may have alleged a state law tort, the injury alleged was not "of constitutional magnitude." Id. at 720.

The Ninth Circuit acknowledged that the correctional officer's alleged acts constituted an abuse of authority. Id. However, the court noted that the conduct alleged represented two isolated incidents. The court also noted that the inmate imported the photos into the prison environment, thereby diminishing the inmate's reasonable expectation of privacy in the pictures. Id. The court concluded that "elevating" the correctional officer's malfeasance "to constitutional dimension would tend to trivialize the Fourteenth Amendment by making it a magnet for all claims involving personal information, state officers, and unfortunate indignities." Id. at 721. The panel affirmed the district court's grant of summary judgment in favor of the defendants. Id. See also Avist v. Cnty. of Napa, No. C 00-1525 VRW, 2000 WL 1268244, at *1-*2 (N.D. Cal. Aug. 31, 2000) (allegations that plaintiff's psychological records were taken from her personnel file at her office and were recovered

approximately two weeks later in an inter-office mail slot, accessible to virtually any employee, did not rise to the level of a constitutional violation of informational privacy).

Distinguishing Davis, the district court in Stafford-Pelt v. California, No. C-04-00496 RMW, 2005 WL 1457782 (N.D. Cal. June 20, 2005), determined that a victim of sexual abuse stated a § 1983 claim for violation of her right to privacy after the defendants, law enforcement officials and a county district attorney, disclosed, via press conferences and dissemination of the police report, allegations of sexual abuse she had made years earlier as a minor. Id. at *3-*4. The district court noted that the defendants disclosed the plaintiff's confidential information to the public at large, rather than to an isolated group, as in Davis. Id. at *5. Moreover, the information released was not a photo but a police report given by a minor regarding sexual molestation, and various state statutory protections of such information gave the plaintiff a legitimate expectation that the government officials would not "arbitrarily release" the information. Id.

In the present case, the pleadings closed long ago. This court now has the benefit of the parties' declarations and documentary evidence before it, materials not available to the late Judge King when he ruled on the motion to dismiss. This court concludes on the present record that this case is more

closely analogous to <u>Davis</u> than to <u>Stafford-Pelt</u>.  All parties

appear to agree that the medical records at issue contained

information of a highly personal nature, and the court concludes

that the Ninth Circuit would likely recognize that a victim of

sexual assault has a right of privacy in the details of the

assault as recorded in the victim's medical records.  That being

said, the disclosure alleged here was isolated to two persons,

attorney Lee Loy and O'Phelan's opponent Askren.  Moreover, like

the plaintiff in <u>Davis</u>, O'Phelan had a diminished expectation of

privacy in the information.  O'Phelan was aware that the records

of her emergency room visit and sexual assault examination would

be turned over to third parties; she signed a consent form to

make it so.  O'Phelan authorized the records to be used "for

legal purposes," a fairly indiscriminate category that does not

explicitly limit disclosure to particular individuals, and she

authorized disclosure of her "entire file," not simply parts of

the file.  <u>See</u> Bolos Decl. Exh. 2 (release form).  Thus, O'Phelan

was aware that her medical records would be disseminated by the

hospital to a larger circle of persons.

Nor can O'Phelan claim to have had a legitimate

expectation that the records would be kept from Lee Loy and

Askren specifically.  By the time of the alleged disclosure,

O'Phelan had filed two civil cases in state court that--by her

own allegation--placed the sexual assault directly in issue.  <u>See</u>

23

FAC ¶¶ 16-20.  Facts and observations recorded in O'Phelan's sexual assault examination and the HMC records constitute relevant evidence in those proceedings.  For example, the toxicology portion of the HMC records had already been introduced in the August 2008 TRO proceeding.  FAC ¶ 20.  Lee Loy and Askren were clearly entitled to, and did, seek discovery regarding the contents of O'Phelan's medical records arising out of her May 19, 2008, hospital visit, and the record reflects that O'Phelan's medical records, as reflected in the HCPD file, were indeed produced by HCPD in 2009 pursuant to subpoena in one of the underlying civil suits.  Lee Loy Decl. ¶ 15; Dan O'Phelan Decl. ¶ 3.

Consequently, the wrong alleged here is necessarily limited to the timing and manner of disclosure, rather than the fact of disclosure itself.  The alleged wrongdoing is therefore more consistent with a possible discovery violation than a constitutional violation.  <u>Accord</u> FAC ¶¶ 42 (alleging that "Lee Loy conspired with Benton Bolos to obtain Plaintiff's medical records without a subpoena, interrogatories, and/or court order for discovery"), 89 (alleging that the disclosure was made "without court order").  The court concludes that the alleged premature disclosure of O'Phelan's records, under the circumstances presented here, represents an isolated incident of

alleged abuse of power that does not support a claim of
constitutional magnitude.[4]  See Davis, 853 F.2d at 720-21.

### 1.        Lee Loy.

Under the analysis above, even if Lee Loy were deemed
to have acted under color of law by virtue of having allegedly
conspired with a state actor, see Adickes v. S.H. Kress & Co.,
398 U.S. 144, 152 (1970), he would nevertheless be entitled to
summary judgment because O'Phelan's claim does not state an
infringement of a constitutional right of privacy.

### 2.        Bolos.

Bolos is similarly entitled to summary judgment for the
reasons discussed above.  As a separate and independent basis for

---

[4]The FAC also asserts generally that O'Phelan has been
denied equal protection of the law under the Fourteenth
Amendment.  See FAC ¶¶ 51, 55, 90.  When questioned at the
hearing on this matter, O'Phelan's counsel stated that Bolos is
liable to her under the Equal Protection Clause of the Fourteenth
Amendment for allegedly singling her out as the sole person whose
sexual assault records he disclosed.  The County argues that no
evidence supports a claim that similarly situated persons
received different treatment, as required to allege an equal
protection claim.  See County Mot. at 24-25; Dillingham v. INS,
267 F.3d 996, 1007 (9th Cir. 2001).  Another way of saying this
is that there is no evidence that Bolos handled O'Phelan's
investigation differently from other cases.  This argument stands
unanswered by O'Phelan's briefing.  The court notes in addition
that O'Phelan cites no authority suggesting that the Equal
Protection Clause treats as a protected class any group
(including any "class of one," a concept sometimes addressed in
equal protection analysis) of sexual assault victims whose
medical records are wrongfully disseminated.  On the present
record, the court concludes that there is no genuine issue of
material fact supporting an equal protection violation.

granting summary judgment, the court concludes that Bolos would
not be liable under § 1983 even if the facts alleged stated a
cognizable claim because Bolos has demonstrated that
there is no genuine issue of material fact as to his entitlement
to qualified immunity.

"[G]overnment officials performing discretionary
functions [are entitled to] a qualified immunity, shielding them
from civil damages liability as long as their actions could
reasonably have been thought consistent with the rights they are
alleged to have violated." <u>Anderson v. Creighton</u>, 483 U.S. 635,
638 (1987)(citations omitted); <u>see also</u> <u>Richardson v. McKnight</u>,
521 U.S. 399, 407-08 (1997).[5]  The Supreme Court has set forth a
two-pronged analysis for resolving government officials'
assertions of qualified immunity.  <u>See</u> <u>Saucier v. Katz</u>, 533 U.S.
194, 201 (2001), <u>overruled in part on other grounds by</u> <u>Pearson v.
Callahan</u>, 555 U.S. 223 (2009).  On the first prong, the court
considers whether the facts, "[t]aken in the light most favorable
to the party asserting the injury[,] . . . show [that] the
[defendant's] conduct violated a constitutional right[.]"
<u>Saucier</u>, 533 U.S. at 201.  The second prong requires the court to

_____

[5]Although O'Phelan also seeks injunctive relief, to which
qualified immunity does not apply, <u>see</u> <u>County of Sacramento v.
Lewis</u>, 523 U.S. 833, 841 n.5 (1998), the requests for injunctive
relief appear to be directed to the County, rather than to Bolos
in his individual capacity.  <u>See</u> FAC at 22-23.  In any event,
Bolos is retired and could not effectuate any of the injunctive
relief requested.  <u>See</u> Bolos Decl. ¶ 2.

determine whether such right was clearly established at the time of the alleged violation. Id.; Scott v. Harris, 550 U.S. 372, 377 (2007). Whether a defendant violated a constitutional right and whether the right was clearly established at the time of the violation are pure legal questions for the court. See Martinez, 323 F.3d at 1183.

A plaintiff bears the burden of proving that the right allegedly violated was clearly established at the time of the violation. If the plaintiff meets this burden, then the defendant bears the burden of establishing that the defendant reasonably believed the alleged conduct was lawful. See Sorrels v. McKee, 290 F.3d 965, 969 (9th Cir. 2002); Trevino v. Gates, 99 F.3d 911, 916-17 (9th Cir. 1996).

Given the governing law set forth above, the court readily concludes that Bolos has qualified immunity with respect to his alleged actions. O'Phelan does not establish that Bolos violated a constitutional right. Even if O'Phelan could be said to have shown such a violation, O'Phelan has not demonstrated that the right was clearly established at the time of the conduct. Her briefing includes no legal argument on this issue. As Bolos points out, Supreme Court and Ninth Circuit authority demonstrates that the constitutional right of informational privacy is murky, at best. See, e.g., NASA, 131 S. Ct. at 756 n.10 (majority opinion) (stating that "only the 'scarce and open-

ended' guideposts of substantive due process" offered guidance to the Court on the existence of a constitutional right to informational privacy); id. at 764 (Scalia, J., concurring) ("A federal constitutional right to 'informational privacy' does not exist."); Nelson v. NASA, 568 F.3d 1028 (9th Cir. 2009) (Kozinski, J., dissenting from denial of rehearing en banc) ("Is there a constitutional right to informational privacy? Thirty-two Terms ago, the Supreme Court hinted that there might be and has never said another word about it."); cf. Whalen, 429 U.S. at 599 (alluding to "the individual interest in avoiding disclosure of personal matters"); Nixon, 433 U.S. at 457 (quoting the above phrase from Whalen).  O'Phelan has not met her burden of establishing that the right she relies on was clearly established.

### 3.      County.

The County is entitled to summary judgment for the reasons discussed above.  Moreover, as a separate and independent basis for granting summary judgment, the court concludes that the County is not liable under § 1983 in any event because O'Phelan does not establish that the County acted pursuant to a policy or custom, as required for § 1983 municipal liability.

In the seminal case of Monell v. Department of Social Services of City of New York, 436 U.S. 658 (1978), the Supreme Court announced that local government units were "persons" for

28

purposes of suit under § 1983, but rejected use of the doctrine of _respondeat superior_ to hold municipalities liable for the unconstitutional acts of employees. _Id._ at 690-91. Instead, the Court held, a municipality is subject to liability under § 1983 if it has caused the deprivation of a constitutionally protected right through "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." _Id._ at 690. Moreover, the Court held, § 1983 authorizes suit "for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." _Id._ at 690-91.

In _Pembaur v. City of Cincinnati_, 475 U.S. 469 (1986), a plurality of the Court held that a municipality may be liable for "a single decision" made by an official "possess[ing] final authority to establish municipal policy with respect to the action ordered." _Id._ at 480-81; _see also_ _St. Louis v. Praprotnik_, 485 U.S. 112, 123 (1988) (plurality opinion) (final authority is a matter of state law), _accord_ _Jett v. Dallas Indep. Sch. Dist._, 491 U.S. 701, 737-38 (1989) (remanding to lower court to consider whether superintendent possessed "final policymaking authority" as to plaintiff's allegedly illegal job transfer).

Finally, the plaintiff may also establish municipal liability by demonstrating that the alleged constitutional violation was caused by a failure to train municipal employees adequately.  See City of Canton, Ohio v. Harris, 489 U.S. 378, 388-91 (1989); Price v. Sery, 513 F.3d 962, 973 (9th Cir. 2008); see also Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 409-10 (1997) (discussing limited scope of such a claim).  Such a showing depends on three elements: (1) the training program must be inadequate "in relation to the tasks the particular officers must perform"; (2) the city officials must have been deliberately indifferent "to the rights of persons with whom the [local officials] come into contact"; and (3) the inadequacy of the training "must be shown to have actually caused the constitutional deprivation at issue."  Merritt v. Cnty. of L.A., 875 F.2d 765, 770 (9th Cir. 1989) (internal citations and quotation marks omitted).

Thus, to establish an official policy or custom sufficient for liability, a plaintiff must prove the deprivation of a federally protected right by: (1) an employee acting under an expressly adopted official policy; (2) an employee acting pursuant to a longstanding practice or custom; (3) an employee acting as a "final policymaker"; or (4) an employee acting as a result of inadequate training due to the municipality's deliberate indifference to individual rights.  See Delia v. City

<u>of Rialto</u>, 621 F.3d 1069, 1081-82 (9th Cir. 2010); <u>Webb v. Sloan</u>, 330 F.3d 1158, 1163-64 (9th Cir. 2003); <u>Merritt</u>, 875 F.2d at 770.

It is not clear on which theory O'Phelan bases her claim of municipal liability. The FAC asserts only that HCPD failed to investigate the alleged rape and "failed to take appropriate action against Detective Benton Bolos," such as removing him from the case or otherwise disciplining him. FAC ¶¶ 89, 91. The County argues, and this court agrees, that there is no genuine issue of material fact as to its liability in this case. <u>See</u> Mem. Supp. Benton Bolos' Mot. Qualified Immunity & Defs. Benton Bolos & County's Mot. J. Pleadings or Mot. for Summ. J. ("County Defs.' Mot.") 26-29, ECF No. 235.

The County presents evidence, through declarations of Benton Bolos and Assistant Police Chief Kanehailua, that HCPD has a General Order prohibiting the unauthorized disclosure of personal information, and that Bolos was trained with respect to this policy. <u>See</u> Kanehailua Decl. ¶¶ 4-6 & Exh. 1; Bolos Decl. ¶ 3. According to Kanehailua, HCPD complies with the federal Health Insurance Portability and Accountability Act's requirements for disclosure of personal information, as well as Hawaii's Uniform Information Practices Act. Kanehailua Decl. ¶ 7. Kanehailua states that HCPD's internal affairs division investigated O'Phelan's complaint against Bolos and also conducted a criminal investigation. <u>Id.</u> ¶¶ 10-11. HCPD

31

forwarded the results of the criminal investigation to the Office of the Prosecuting Attorney. Id. ¶ 11. Bolos also states that he has received training in conducting sexual assault investigations. Bolos Decl. ¶ 3. Finally, Bolos states that his final position at HCPD was as Sergeant/Detective and that he did not have final decisionmaking authority within HCPD. Bolos Decl. ¶¶ 2, 15.

For her part, O'Phelan has not directed this court to any policy, officially adopted and promulgated by the County. Nor has she established a permanent and well-settled practice that constitutes a custom that Bolos followed in allegedly releasing O'Phelan's medical information without her permission. See Praprotnik, 485 U.S. at 121. She does not allege or adduce evidence that Bolos was a final decisionmaker in any area, or that he was inadequately trained. See Pembaur, 475 U.S. at 480-81; Merritt, 875 F.2d at 770.

O'Phelan's entire argument in support of the County's liability appears to be that the County has refused to provide discovery regarding its investigation into the incident and has not disclosed a procedures manual for handling SANE records. See Opp. to County's Mot. Summ. J. & Def. Lee Loy's Mot. Summ. J. ("Opp.") 38, 40, ECF No. 282. O'Phelan argues that, because she does not possess information regarding officers' training in responding to complaints, "it is unfair to Plaintiff that

32

Defendants assert that the training is satisfactory." Id. But O'Phelan has obtained no order compelling such discovery and presents no reason to think that a manual unique to SANE records exists.  Neither the Opposition nor O'Phelan's Concise Statement of Facts, ECF No. 282-3, includes any actual evidence that supports any theory of municipal liability.  To the contrary, O'Phelan "admits" the County's assertion that the training of recruits complies with HCPD General Orders and admits that one of the County's General Orders directly prohibits unauthorized disclosure of personal records/information.  Pl.'s Concise Stmt. Facts at 7.

This case has been pending since May 2009, giving O'Phelan ample time to seek discovery and bring all necessary discovery motions.  Discovery has closed, and trial is scheduled to begin less than two months from now.  See Third Amended Rule 16 Scheduling Order, ECF No. 160.  O'Phelan's lack of factual support for her claim at this point in the case cannot be attributed to the County.  Lacking specific facts suggesting that any genuine issue for trial exists, the court grants summary judgment to the County on O'Phelan's § 1983 claim.  See Porter, 419 F.3d at 891.

C.        Conspiracy (Second Cause of Action).

The court interprets O'Phelan's second cause of action, for conspiracy, as alleging both a civil conspiracy and a

33

conspiracy to violate § 1983.  Because Defendants are entitled to summary judgment on O'Phelan's § 1983 claim, Defendants are also entitled to summary judgment on any claim, based on identical facts, that they conspired to violate § 1983.  See Cassettari v. Nevada County, Cal., 824 F.2d 735, 739 (9th Cir. 1987) (noting that "[t]he insufficiency of these allegations to support a section 1983 violation precludes a conspiracy claim predicated upon the same allegations").

By contrast, the court finds that there is a genuine issue of material fact regarding whether Lee Loy conspired with Bolos to invade O'Phelan's privacy.  The court denies summary judgment to Lee Loy on this claim, but, because O'Phelan adduces no evidence of malice on the part of Bolos, grants Bolos and the County summary judgment on this claim.

1.        Lee Loy.

O'Phelan alleges that Bolos and Lee Loy agreed to share, and Bolos provided to Lee Loy, O'Phelan's medical records. FAC ¶¶ 91-93.  Hawaii courts have stated that "the accepted definition of a conspiracy is a combination of two or more persons or entities by concerted action to accomplish a criminal or unlawful purpose, or to accomplish some purpose not in itself criminal or unlawful by criminal or unlawful means." Fisher v. Grove Farm Co., Inc., 123 Haw. 82, 116, 230 P.3d 382, 416 (Ct. App. 2009).  This court has therefore stated that "the common law

34

tort of civil conspiracy has three elements: (1) the formation of
a conspiracy; (2) wrongful conduct in furtherance of the
conspiracy, i.e., an actionable claim based upon deceit; and (3)
damage." Young v. Bishop Estate, Civ. No. 09-00403 SOM/BMK, 2009
WL 3763029, at *14 (D. Haw. Nov. 6, 2009). Civil conspiracy
arises out of two or more defendants' specific actionable
conduct--it does not alone constitute a claim for relief. Siu v.
de Alwis, Civ. No. 07-00386 BMK, 2009 WL 1789319, at *11 (D. Haw.
June 18, 2009).

        The court turns next to the alleged object of the
alleged civil conspiracy--to invade O'Phelan's privacy. The
Restatement (Second) of Torts categorizes the tort of invasion of
privacy into four types: "(1) unreasonable intrusion upon the
seclusion of another; (2) appropriation of another's name or
likeness; (3) unreasonable publicity given to the other's private
life; and (4) false light." Mehau v. Reed, 76 Haw. 101, 111, 869
P.2d 1320, 1330 (1994) (quoting Rest. (Second) of Torts § 652A-E
cmt. b (1977)); see also Shahata v. W Steak Waikiki, LLC, 721 F.
Supp. 2d 968, 986 (D. Haw. 2010) (applying the Restatement
(Second) of Torts to state law invasion of privacy claim).
O'Phelan is silent as to which prong of invasion of privacy
applies to her claim, and, lacking guidance from her, the County
argues that a claim for public disclosure of private facts would
fail. County Mot. at 32-34. The court agrees that O'Phelan has

no factual ground for relying on this prong of invasion of privacy, <u>see</u> Rest. (Second) of Torts § 652D, but holds that the record raises a question of fact as to whether an intrusion occured.

One is liable for intrusion into another's seclusion if one "intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns . . . if the intrusion would be highly offensive to a reasonable person." Rest. (Second) of Torts § 652B. Comment B to section 652B of the Restatement provides, as an example of intrusion, a person who forges a court order to gain access to another's personal bank account, and then does access the account, to gather evidence for use in a civil action the tortfeasor is bringing against the other.

Lee Loy's statements to the state court in September 2008 provide some evidence that Lee Loy and Bolos reached an agreement under which Bolos would show Lee Loy "new evidence" in the form of O'Phelan's medical records. O'Phelan's testimony regarding Bolos's alleged phone call to her around that time provides evidence that Bolos showed Lee Loy the medical records to gain access to Lee Loy's client, Askren. Dan O'Phelan's testimony regarding calls from Bolos and Lee Loy provides further evidence that such an agreement existed and that Lee Loy did access Ellen O'Phelan's medical records without authorization.

Lee Loy's response to the foregoing evidence is to argue, essentially, "I didn't do it." Lee Loy argues that Dan O'Phelan has changed his story regarding what he believes Lee Loy did with respect to Ellen O'Phelan's medical records. Lee Loy Mot. at 11-13. Lee Loy also contends that, by the time of the August 2008 state court hearing, Bolos's investigation had turned up various facts that cast doubt on Ellen O'Phelan's allegations of rape. Lee Loy Mot. at 15-17. According to Lee Loy, Lee Loy's failure to disclose those facts at the August 2008 hearing demonstrates that Bolos did not provide Lee Loy with that information, and therefore they must not have had an agreement. Lee Loy Mot. at 15-17. Similarly, Lee Loy argues, his own failure to disclose facts in the medical records that were helpful to Askren's case at the August 2008 state court hearing demonstrates that Lee Loy had not seen the medical records at that point. Lee Loy Mot. at 14-16.

These facts do not demonstrate that Lee Loy is entitled to prevail, as a matter of law, on his claim. Lee Loy nowhere mentions the requirements of invasion of privacy. Instead, Lee Loy's argument in favor of granting summary judgment consists of disputing the facts asserted by O'Phelan. <u>See</u> Mot. at 11-17. O'Phelan raises a triable issue of fact as to whether Lee Loy conspired to violate O'Phelan's right of privacy.

2.        Bolos.

As discussed above, Bolos has qualified immunity with respect to O'Phelan's § 1983 claim against him.  Furthermore, Bolos argues, he has a qualified or conditional privilege that protects him from liability for the asserted common law claims, including conspiracy.  The court agrees.

Hawaii law provides that a nonjudicial government official has a qualified or conditional privilege with respect to his or her tortious actions undertaken in the performance of his or her public duty.  See Medeiros v. Kondo, 55 Haw. 499, 504, 522 P.2d 1269, 1272 (1974); Marshall v. Univ. of Haw., 9 Haw. App. 21, 36-37, 821 P.2d 937, 946 (Ct. App. 1991), abrogated on other grounds by Hac v. Univ. of Haw., 102 Haw. 92, 73 P.3d 46 (2003).  This privilege shields all but "the most guilty of officials" from liability, although not from the imposition of the suit itself.  See Medeiros, 55 Haw. at 504, 522 P.2d at 1272.  The privilege, which flows from the Hawaii Supreme Court's balancing of competing interests, protects the innocent public servant's pocketbook, yet allows an injured party to be heard.  Id.

For a tort action to lie against a nonjudicial government official, the injured party must allege and demonstrate by clear and convincing proof that the official was motivated by malice and not by an otherwise proper purpose.  See id.; Awakuni v. Awana, 115 Haw. 126, 142, 165 P.3d 1027, 1043

38

(2007) (holding that qualified privilege applied when there was no "evidence that any of the [defendants'] actions were motivated by ill will or an intention to commit, or reckless disregard of committing, a wrongful act against any of the [plaintiffs]"); see also Towse v. Haw., 64 Haw. 624, 633-34, 647 P. 2d 696, 703-04 (1982) (affirming grant of summary judgment to state prison guards on plaintiffs' state law defamation claim because the plaintiffs offered no evidence of malice). When a public official is motivated by malice and not by an otherwise proper purpose, Hawaii law provides that the cloak of immunity is lost and the official must defend the suit the same as any other defendant. Marshall, 9 Haw. App. at 37, 821 P.2d at 946.

O'Phelan's allegation of "malicious" action on the part of Bolos, FAC ¶ 103, is in tension with her position that Bolos's motivation in allegedly releasing the medical records to Lee Loy was to further the rape investigation. According to O'Phelan, Bolos gave the material to Lee Loy in the hope of gaining access to Askren, Lee Loy's client, in return. See Ellen O'Phelan Decl. ¶ 3 (stating that Bolos told Ellen O'Phelan that Bolos released the information to get Askren to "talk"); Opp. at 28 (same). Furthering the rape investigation--one of the remedies sought in this suit by O'Phelan--is not an "improper purpose" under the circumstances presented. Bolos, for his part, declares he bore

39

no malice toward O'Phelan, Bolos Decl. ¶ 16, and O'Phelan points to no evidence contradicting this statement.

The court concludes that, even if O'Phelan's allegations regarding Bolos are true, they demonstrate, at most, a misguided investigation strategy, rather than malicious action directed at O'Phelan by a state official. <u>Cf.</u> <u>Tucker v. Perez</u>, Civ. No. 09-00376 SOM/KSC, 2010 WL 3853299, at *5 (D. Haw. Sept. 27, 2010) (allegations that police officer subduing a fight committed a battery upon plaintiff because the police officer favored the other party involved in the fight were insufficient to demonstrate malice toward plaintiff); <u>Tongson v. County of Maui</u>, Civ. No. 05-00683 BMK, 2007 WL 2377356, at *6-*7 (D. Haw. Aug. 15, 2007) (holding that county official was entitled to qualified immunity from state law tort claim based on official's uncontroverted affidavit setting forth proper purpose for allegedly illegal actions, and lack of evidence suggesting otherwise). O'Phelan points the court to no evidence suggesting any other motive on the part of Bolos. Concluding that there is no genuine issue of fact as to whether Bolos acted maliciously, this court grants summary judgment to Bolos on the claim for civil conspiracy.

### 3. <u>County.</u>

O'Phelan alleges that, when Bolos's supervisor was made aware of this, the supervisor failed to ensure that the rape

investigation would not be compromised.  FAC ¶ 102.  She alleges
that the County was "made aware of the improper relationship and
conspiracy" between Bolos and Lee Loy.  FAC ¶ 104.  A
municipality is "subject to the state's tort laws in the same
manner as any other private tortfeasor may be liable for state
law torts that its agents committed."  <u>Kahale v. City & Cnty. of
Honolulu</u>, 104 Haw. 341, 349, 90 P.3d 233, 241 (2004); <u>see also
Lauer v. Young Men's Christian Ass'n of Honolulu</u>, 57 Haw. 390,
402, 557 P.2d 1334, 1341 (1976) (holding that a municipality may
be liable "on the same principles which impose liability on a
non-municipal principal for the tortious conduct of its agents").

O'Phelan does not provide evidence of the County's
independent malice toward her.  Nor does she show that the
alleged failure to take action constituted such deliberate
indifference that it evidenced malice.  Instead, this tort claim
against the County appears to be based on a <u>respondeat superior</u>
theory.  The State of Hawaii recognizes a <u>respondeat superior</u>
theory that holds a municipality liable for the tortious acts of
its agents committed with "malice" within the scope of the
agents' employment.  <u>See</u> <u>Lane v. Yamamoto</u>, 2 Haw. App. 176, 178,
628 P.2d 634, 636 (Ct. App. 1981), <u>cf.</u> <u>Faaita v. Liang</u>, Civ. No.
07-00601 LEK, 2009 WL 3124763, at *18 n.10 (D. Haw. Sept. 29,
2009) (dismissing tort claim against City and County of Honolulu
because the individual employee defendants were immune from

suit); <u>Turner v. City & County of Honolulu</u>, Civ. No. 06-00616
JMS/LEK, 2007 WL 1341132, at *5 n.7 (D. Haw. May 3, 2007) (same).

As discussed above, there is no genuine issue of fact
as to whether Bolos acted maliciously.  Because Bolos is entitled
to summary judgment on O'Phelan's claim of civil conspiracy,
based on his immunity from suit, the County is entitled to
summary judgment as well.

D.          <u>Trespass to Chattels (Third Cause of Action).</u>

Bolos and the County argue that Hawaii's state courts
have never recognized a cause of action for the common law tort
of trespass to chattels.  The court has been unable to locate any
Hawaii precedent addressing such a claim.  Even assuming such a
cause of action is available in Hawaii, the court doubts that
O'Phelan has the physical possessory interest in her medical
information necessary to maintain a trespass to chattels claim.
<u>See</u> Rest. 2d Torts § 217 ("A trespass to a chattel may be
committed by intentionally (a) dispossessing another of the
chattel, or (b) using or intermeddling with a chattel in the
possession of another."); <u>id.</u> § 216 ("In the Restatement of this
Subject, a person who is in 'possession of a chattel' is one who
has *physical control* of the chattel . . . .") (emphasis added).
In any event, O'Phelan's opposition brief fails to provide any
argument in response to the portion of the motion for summary
judgment addressing this claim.  The court concludes that

42

O'Phelan has abandoned this claim and grants summary judgment to Defendants.

E.        Trespass to Land (Fourth Cause of Action).

Defendants move for summary judgment as to the Fourth Cause of Action.  See County Mot. at 31-32.  Judge King previously dismissed this cause of action from the case.  See Order Granting in Part and Denying in Part Defendant Lee Loy's Motion to Dismiss 10-11, Jan. 27, 2010, ECF No. 41.  That dismissal remains in effect.

F.        Negligent Infliction of Emotional Distress (Fifth Cause of Action).

Defendants are entitled to summary judgment on O'Phelan's Fifth Cause of Action, for negligent infliction of emotional distress ("NIED").  To prove this claim, a plaintiff must demonstrate: (1) that the defendant engaged in negligent conduct; (2) that the plaintiff suffered serious emotional distress; and (3) that such negligent conduct of the defendant was a legal cause of the serious emotional distress.  Tran v. State Farm Mut. Automobile Ins. Co., 999 F. Supp. 1369, 1375 (D. Haw. 1998).  A cognizable claim for NIED under Hawaii law also "requires physical injury to either a person or property," see Calleon v. Miyagi, 76 Haw. 310, 320, 876 F.2d 1278 (1994), or a mental illness, see Haw. Rev. Stat. § 663-8.9.

As Dan O'Phelan, O'Phelan's counsel, acknowledged during the hearing on this matter, neither the allegations of the

43

FAC nor the evidence produced in this case demonstrate that Ellen O'Phelan has suffered any physical injury or mental illness because of the alleged disclosure of her medical information. See FAC ¶¶ 121-23 (alleging emotional distress); Ellen O'Phelan Decl. ¶ 14 (same). The court grants summary judgment to Defendants on this claim.

G.      Common Law Invasion of Privacy (Sixth Cause of Action.

For the reasons set forth in Part V.C ("Conspiracy"), above, Lee Loy's summary judgment motion on this claim is denied, but Bolos and the County's motions for summary judgment are granted.

H.      Intentional Infliction of Emotional Distress (Seventh Cause of Action).

O'Phelan's final cause of action is for intentional infliction of emotional distress ("IIED"). The court finds that no genuine issue of material fact exists as to Defendants' liability, and grants summary judgment in favor of Defendants.

To prove this tort under Hawaii law, a plaintiff must show: "1) that the act allegedly causing the harm was intentional or reckless, 2) that the act was outrageous, and 3) that the act caused 4) extreme emotional distress to another." Hac, 102 Haw. at 106-07, 73 P.3d at 60-61. "Outrageous" conduct is that "exceeding all bounds usually tolerated by decent society and which is of a nature especially calculated to cause, and does

cause, mental distress of a very serious kind." Id., 102 Haw. at 106, 73 P.3d at 60. It is for the court to decide, in the first instance, whether the alleged actions may be considered unreasonable or outrageous. Young v. Allstate Ins. Co., 119 Haw. 403, 429, 198 P.3d 666, 692 (2008).

The court concludes that O'Phelan's allegations, and her supporting evidence, do not allege "outrageous" conduct sufficient to support a claim for IIED. O'Phelan herself filed two civil suits besides this one in which she put the sexual assault in issue, and medical evidence was disclosed in both cases. As discussed in Part V.B, above, the toxicology report was introduced in the TRO proceeding, and the remainder of the medical records in HCPD's possession was produced in conjunction with the other civil case in 2009. In this context, the premature disclosure of the records, while possibly a discovery or even some statutory violation (not specified by O'Phelan), is insufficient to allege the outrageous conduct necessary to support a claim for IIED. Otherwise, every discovery or statutory violation would support an IIED claim.

VI.     CONCLUSION.

Summary judgment is GRANTED in part and DENIED in part as to Lee Loy. The only remaining claims against Lee Loy are the Sixth Cause of Action for invasion of privacy, and a common law conspiracy claim (the Second Cause of Action) associated with the

invasion of privacy claim.  Summary judgment is GRANTED on all claims against Bolos and the County.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, February 18, 2011.



_/s/ Susan Oki Mollway_
Susan Oki Mollway
Chief United States District Judge

O'Phelan v. Lee Loy; Civil No. 09-00236 SOM/KSC; ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT GERARD LEE LOY'S MOTION FOR SUMMARY JUDGMENT [ECF NO. 221]; ORDER GRANTING SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS BENTON BOLOS AND COUNTY OF HAWAII [ECF NO. 224].

46